894 F.2d 408
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas K. LENHARD, Defendant-Appellant.
 No. 88-2145.
 United States Court of Appeals, Sixth Circuit.
 Jan. 26, 1990.
 
 Before KEITH, NATHANIEL R. JONES and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-appellant, Thomas K. Lenhard, appeals from the district court's judgment and commitment order for mail fraud on the basis that the guilty verdict was against the weight of the evidence. For the following reasons, we affirm.
 
 I.
 
 2
 Lenhard was a business agent for Local 79 of the Service Employee's International Union, based in Detroit. Beginning in December 1983, the union leased a 1984 Jeep Cherokee from GMAC Leasing for Lenhard's benefit. In 1985 Lenhard started to experience some troubles with the car and desired to lease a new Jeep; however, the union denied this request. In the summer of 1986, James Arndt, a friend and contemporary of Lenhard's son, Thomas Lenhard, Jr. (Junior), worked part-time doing odd jobs at Willow Brook Farm in Novi, Michigan, which was owned by Junior.
 
 
 3
 In June 1986 Lenhard met Arndt while he was at the farm. According to Arndt's testimony at trial, Lenhard complained about the poor condition of his Jeep. Arndt testified that when he heard this, he recalled a conversation that he had earlier that year with "Gary," an associate of Arndt's in previous cocaine deals who purported to be knowledgeable about the stolen car business. Unknown to Arndt at the time, Gary was actually an informant for the Michigan State Police. Gary told Arndt that he had a friend who would buy cars from people who wanted to commit insurance frauds. Arndt alleges that after he mentioned his previous discussions with Gary, Lenhard was receptive to the idea of an insurance fraud scheme. J.App. at 76-77.
 
 
 4
 Thereafter, Arndt contacted Gary, who then introduced Arndt to "Buddy." "Buddy" was actually Detective Sergeant Charles Chapman, an undercover member of the Michigan State Police. Buddy indicated his willingness to buy the Jeep for $200.00 and dispose of it so that Lenhard could report it stolen and receive the insurance money. Arndt testified that he explained this arrangement to Lenhard, who then turned over the car to him. Id. at 78-80. On June 19, 1986, Arndt drove the Jeep to a rest stop on a highway in suburban Detroit, where Buddy took possession of the Jeep. Buddy instructed Arndt that Lenhard should not report the Jeep stolen until Buddy returned the license plate from the Jeep to Arndt. On June 24, 1988, five days later, Buddy returned the license plate to Arndt's home, and subsequently Arndt told Lenhard that he could report the car as stolen.
 
 
 5
 On June 27, 1988, Lenhard reported to the Detroit Police that his Jeep had been stolen from the Local 79 parking lot sometime between June 24 and June 27. He told the same story to the Michigan Mutual Insurance Company, the insurance carrier whose policy covered the Jeep. Id. at 154-55. As a result of this insurance claim, GMAC Leasing received $8,071.89 as an insurance payment from Michigan Mutual. Id. at 150-52. Subsequently, Local 79 entered into a lease for a new 1986 Jeep Cherokee for Lenhard to use. Id. at 50-51.
 
 
 6
 Lenhard told a different account of the events in question. At his trial he testified that he occasionally let the workers on his son's farm work on his Jeep when it needed minor repairs. In June 1986, when Lenhard met Arndt at the farm, Lenhard claims that he agreed to pay Arndt to fix a water pump in the car. On this basis, Lenhard admits that he gave the car to Arndt on June 17, 1988, and paid him $50.00 to buy a new water pump. Id. at 188-191. According to Lenhard, he did not find out that the car was stolen until June 22, 1988, when Arndt told him that he left the keys in the car while at the farm and later found it missing. Id. at 194-95. Lenhard testified that he had serious doubts at that time about the truth of Arndt's story. Lenhard subsequently hired private investigator George McGinity to search for the car, but the search was unsuccessful. Id. at 195-97. Lenhard admitted that he lied when reporting the car stolen from the Local 79 parking lot instead of his son's farm. He explained that there had already been a lawsuit stemming from a dog bite on his son's farm, and he did not want any more lawsuits to arise from his son's farm because it might cause his son to lose his lease. Id. at 197-98.
 
 
 7
 On March 31, 1988, a federal grand jury in the Eastern District of Michigan returned a four-count indictment charging Lenhard with mail fraud in violation of 18 U.S.C. 1341 and 18 U.S.C. 2(a) (1982), because as part of the processing of the insurance claim, the United States Postal Service was used to transmit the following: an automobile loss notice from an insurance agency to Michigan Mutual; a request for a police report from Michigan Mutual to the Detroit Police Department; a letter from Local 79's attorney to Michigan Mutual; and a police report from the Detroit Police Department to Michigan Mutual. On August 11, 1988, after a four-day trial before the United States District Court for the Eastern District of Michigan, Judge Julian A. Cook, Jr., presiding, the jury returned a verdict of guilty on all four counts of the indictment. J.App. at 40-42. On October 27, 1988, the court sentenced Lenhard to two years imprisonment on each count, but suspended the execution of all but the first 10 months of the sentences in favor of five years probation, with all sentences to run concurrently.
 
 II.
 
 8
 On appeal Lenhard argues that the district court improperly denied his motion for a new trial because the jury verdict was against the weight of the evidence. We review the district court's denial of a Fed.R.Crim.P. 33 motion for a new trial under an "abuse of discretion" standard. United States v. Ashworth, 836 F.2d 260, 266 (6th Cir.1988). Fed.R.Crim.P.Rule 33 states that "the [trial] court on motion of a defendant may grant a new trial if required in the interest of justice." When considering a Rule 33 motion for a new trial based upon the weight of the evidence, district courts can "consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror." United States v. Turner, 490 F.Supp. 583, 593 (E.D.Mich.1979), aff'd, 633 F.2d 219 (6th Cir.1980), cert den., 450 U.S. 912 (1981). However, such motions "are not favored" and should only be granted "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." Id. (emphasis added). Using this standard, the district court in the instant case denied the Rule 33 motion, finding that the evidence did not preponderate against the verdict.
 
 
 9
 In Ashworth, this court noted that while Turner discloses the proper standard for district courts to follow in such motions,
 
 
 10
 the court of appeals does not sit as a 'thirteenth juror' to judge the credibility of witnesses. Neither do we reweigh the evidence. Rather, we are limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not 'preponderate heavily against the verdict' is a clear and manifest abuse of discretion.
 
 
 11
 836 F.2d at 266.
 
 
 12
 Lenhard argues that the weight of the evidence was against the guilty verdict because Arndt's testimony was not credible. At trial, Lenhard's counsel thoroughly cross-examined Arndt, attempting to place his truthfulness into doubt. Arndt admitted that after his arrest for delivering a stolen vehicle to a police officer ("Buddy"), he told the government on several occasions that Lenhard was not involved, but they did not believe this story. Id. at 87-88. Subsequently, Arndt changed his story, telling the government about Lenhard's alleged involvement in the scheme as part of his plea agreement. Even then, the story that Arndt told during his plea statement was inconsistent on certain details with his testimony in court. Id. at 104-7. During his cross-examination, Arndt admitted having made inconsistent statements, but testified that he was telling the truth to the jury. Id. at 110.
 
 
 13
 The cross-examination also revealed that Arndt had previously had a cocaine habit and that he had been arrested for selling cocaine to undercover police officers. Id. at 88-90. Arndt admitted that he had "boasted" to these undercover officers that he would steal, cheat, and lie to support his cocaine habit, and that he could get them some stolen construction equipment. Id. at 92-93. Arndt also admitted that while awaiting sentencing on the cocaine related offenses, his urine tested positive for cocaine use. He then revealed that he lied to Judge Cook at the hearing for the acceptance of his plea when he told Judge Cook that he no longer was on cocaine. Id. at 111.
 
 
 14
 Upon review of the record, we believe that the district court's denial of the motion for new trial was not an abuse of discretion. The government's theory of the case was that Lenhard engaged in insurance fraud so that he could get a new Jeep from Local 79. There was evidence that the 1984 Jeep was in the shop several times, that its condition had deteriorated to "almost undriveable," and that Lenhard's request for a new Jeep was denied by Local 79. Clearly, the evidence indicates a motive for Lenhard to engage in the insurance fraud. In addition, Sergeant Chapman, a.k.a. "Buddy," testified that Arndt told him about Lenhard's desire to get out of the lease for the old Jeep and then get a new one.
 
 
 15
 In essence, Lenhard contends that Arndt is lying, and that his story is more believable than Arndt's. There is no doubt that Arndt's credibility was shaken by his admission to lying to officers in his original story (pre-cooperation), his drug involvement, and the inconsistencies of his pretrial statement and his testimony at trial. Nevertheless, the inconsistencies involved small details, such as the amount of time that elapsed between the time that Arndt received the Jeep from Lenhard and the time he turned it over to "Buddy." Such details are not central to Arndt's testimony. The crux of his story has remained unchanged since he started cooperating with the government: that he and Lenhard acted in concert to dispose of the Jeep and report it stolen so Lenhard could break the lease for the Jeep and so Arndt could make $200.00. This testimony was consistent with other facts in the case, such as Lenhard's admitted lies to the Detroit Police and Michigan Mutual Insurance about the location and timing of the theft of the Jeep.
 
 
 16
 In addition, there were parts of Lenhard's story that did not jibe with the facts. Lenhard reported to the Detroit Police that his Jeep was stolen between June 24 and June 27, 1988 in the Local 79 parking lot. However, the Jeep was in the custody of Sergeant Chapman since June 19, 1988, when Arndt turned it over to him. Lenhard's explanation for lying to the police about the location and date of the "stealing"--that he did not want any more lawsuits coming out of his son's farm--can be characterized as a weak excuse, at best.
 
 
 17
 It is up to the jury to make credibility determinations. The jury decided that Arndt's story was more believable than Lenhard's, despite Arndt's past credibility problems and his inconsistent statements concerning details of the case. The district court, acting as a "thirteenth juror" and weighing the credibility of the witnesses, agreed that Arndt's story was more consistent with the evidence than Lenhard's tale. Our review of the evidence indicates that the guilty verdict was not against the weight of the evidence, given the credibility determinations made by the district court. As such, we find that the district court did not abuse its discretion by denying the Rule 33 motion for a new trial.
 
 III.
 
 18
 For the foregoing reasons, the judgment of the district court is AFFIRMED.